# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOAN M. REITZ, | ) | CASE NO. 5:21-cv-2259 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| LAUREL LAKE RETIREMENT | ) | |
| COMMUNITY, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion for summary judgment filed by defendant Laurel Lake Retirement Community, Inc. ("Laurel Lake"). (Doc. No. 29.) Plaintiff Joan M. Reitz ("Reitz") filed a response in opposition (Doc. No. 34), and Laurel Lake filed a reply. (Doc. No. 35.) For the reasons set forth herein, Laurel Lake's motion is denied.

## I.    BACKGROUND

On November 30, 2021, Reitz filed a complaint against Laurel Lake under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, alleging that her former employer had misclassified her as an exempt employee and, further, had willfully failed to timely pay her overtime. (Doc. No. 1 (Complaint) ¶¶ 18, 23.) She also alleges that Laurel Lake failed to keep accurate records of the hours she worked, as required for non-exempt employees under the FLSA. (*Id.* ¶ 28.)[1]

---

[1] As explained more fully below, the Court need not reach this issue at this time because there are genuine issues of material fact regarding whether Reitz's position was properly classified as exempt.

Laurel Lake is a continuing care retirement community. (Doc. No. 30-1 (Declaration of Lisa M. Mitchell) ¶ 2.) Like other senior living facilities, Laurel Lake offers a variety of living options for its residents, including traditional nursing rooms, apartments, and villas. (Doc. No. 30-3 (Deposition of Donna Ruth Anderson), at 20.)[2] What sets it apart from other facilities is that it permits new residents to request and receive custom renovations to their apartment or villa before they move in, in addition to standard renovations that contractors perform for all new residents. (*Id.* at 5, 7; Doc. No. 30-2 (Declaration of Steve Tartaglione) ¶ 6.) The duties and responsibilities associated with overseeing and facilitating these renovations lie at the heart of this litigation.

In 2019, Laurel Lake created the position of Marketing & Move Coordinator, a position within the marketing department, to coordinate the renovation and move-in process. Reitz was the first employee to hold this position and did so from December 1, 2019 to October 4, 2020. Prior to that, she served as the Marketing Administrative Assistant from May 2017 to November 2019. (Doc. No. 1 ¶ 11.)

Before Laurel Lake created the Marketing & Move Coordinator position, many of the duties associated with the move-in process were performed by a "move-in coordinator" who was also a "painter/mechanic" and worked for Laurel Lake's maintenance department. (Doc. No. 30-3, at 13–14.) Tim Hanna served in this role, and there is no dispute that this position was non-exempt. (*Id.* at 2.) In addition to painting walls in units, Hanna completed duties such as delivering items to units, removing trash during renovations, and storing items that were removed from units during renovations and could be reused. (Doc. No. 30-7 (Deposition of Joan Reitz), at 21.)

---

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system.

Shortly before Hanna retired, Laurel Lake created the Marketing & Move Coordinator position. (Doc. No. 30-3, at 15–16.) Reitz shadowed Hanna in preparation for filling this role. (Doc. No. 34-1 (Deposition of Joan Reitz), at 3.) Included in this new position were the move-in coordination duties previously fulfilled by Hanna, but not his painter/mechanic duties. (Doc. No. 30-3, at 13–14.) Additionally, the position came with certain new marketing duties, including taking calls from potential residents, making appointments for potential residents to tour units, giving tours of units, providing potential residents with informational materials, and assisting in the planning of marketing events. (Doc. No. 30-7, at 4–5.)

In developing the new position, Laurel Lake sought the advice of Organizational Consulting Group (OCG), a third-party consultant that assists Laurel Lake with various employment matters including FLSA exemption status. (Doc. No. 30-5 (Deposition of Lisa Mitchell), at 2.) In accordance with OCG's advice, Laurel Lake designated the position as exempt. (Doc. No. 30-3, at 16.) Laurel Lake paid Reitz an annual salary of $42,500. (Doc. No. 1 ¶ 18.)

Laurel Lake's position is that Reitz had considerable discretion over the entire renovation and move-in process. For example, it notes that Reitz was responsible for "[i]nitially inspecting each vacant unit to make decisions [] as to what standard renovations, repairs, and upgrades needed to be performed in the unit to prepare it for the next resident[;]" "contacting the appropriate contractors and vendors from approved contractors and vendors to obtain the quotes and bids . . . and selecting the contractor or vendor to recommend to the new resident;" and "[s]cheduling the contractors to perform the work and ordering the materials from vendors to ensure the renovations meet the 90-day deadline for completing all renovations." (Doc. No. 30-2 ¶ 7.)

3

Reitz agrees that she was intimately involved in the renovation and move-in process. She explains that her duties included tasks such as "meeting with residents to obtain information from them with respect to what changes, modifications, and/or renovations they requested be performed within their units" (citing Doc. No. 34-1, at 9); Doc. No. 34-3 (Deposition of Donna Ruth Anderson), at 10, 12, 21); "showing residents carpet samples, paint colors, counter-top options, etc. that were preapproved and already available in Defendant's showroom" (citing Doc. No. 34-1, at 9–10); and "finding out which contractors were available from Defendant's pre-selected list in order to obtain bids and schedule jobs, compiling the bids, and providing the bids to, and discuss[ing] them with, Defendant's Maintenance Supervisor/Manager Steve Tartaglione" (citing Doc. No. 34-3, at 12, 15, 21; Doc. No. 34-1, at 8, 10–11). (Doc. No. 34, at 8.) But Reitz disagrees with Laurel Lake regarding the authority and level of discretion that she had. As explained below, it is Reitz's position that she was merely a go-between who passed information among the maintenance department, contractors, and residents.

## II.   DISCUSSION

### A.  Legal Standard on Summary Judgment

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; "[a] mere scintilla of evidence is insufficient[.]" *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### B. Analysis

Laurel Lake has filed a Motion for Summary Judgment seeking summary dismissal in its favor on the issues of classification or, alternatively, on willfulness. (Doc. No. 29 ¶¶ 1, 7.) Each argument will be addressed in turn.

#### 1. *Reitz's Exempt Classification Under FLSA*

The FLSA requires an employer to compensate an employee who works more than forty hours per workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA exempts from this overtime pay requirement any employee who is employed "in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). Until recently, courts "'narrowly construed [these exemptions] against the employers seeking to assert them[.]'" *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)). But in *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 138 S.

Ct. 1134, 200 L. Ed. 2d 433 (2018), the Supreme Court cast doubt on the continued viability of that principle, noting that, since "the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation." *Id*. at 1142 (internal quotation marks and citation omitted).

Laurel Lake contends that Reitz's position met all requirements for the administrative exemption. (Doc. No. 30 (Memorandum in Support), at 5.) The FLSA does not define this exemption. *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 741 (6th Cir. 2000). Regulations issued by the United States Department of Labor ("DOL"), which courts must give "controlling weight[,]" identify the criteria that must be met to satisfy the administrative exemption under the FLSA. *Id.* According to the applicable DOL regulation, an employee is considered "employed in a bona fide administrative capacity" if the employee: (1) is "[c]ompensated on a salary or fee basis . . . of not less than $684 per week . . . ;" (2) has a primary duty that "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) has a "primary duty" that "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The parties agree that Reitz was compensated on a salary basis and paid at least $684 per week (Doc. No. 29 ¶ 5),[3] but they disagree as to whether Reitz's position satisfied the second and third requirements.

Laurel Lake contends that one reason why Reitz is exempt from overtime requirements is that her primary duty was "the performance of office or non-manual work directly related to the

---

[3] Reitz was actually paid more than this baseline—her salary was $42,500 per year, which amounted to approximately $817 per week. (Doc. No. 1 ¶ 18.)

management or general business operations of the employer or the employer's customers[,]" as required by 29 C.F.R. § 541.201. (Doc. No. 30, at 15.) Laurel Lake argues that Reitz's duty of "overseeing the renovation process" was "directly related to" Laurel Lake's "principal production activity," which was "providing a healthy, active continuing care retirement community that promotes longevity." (*Id.* at 17.) In so arguing, Laurel Lake analogizes Reitz's duties to those of the employees in *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512 (6th Cir. 2004), and *Burton v. Appriss, Inc.*, 682 F. App'x 423 (6th Cir. 2017), in which the Sixth Circuit held that planners working for a utility company and an account manager of a software services company, respectively, met this requirement. (Doc. No. 30, at 16–17.)

Reitz argues that her position did not meet this requirement. (Doc. No. 34, at 14.) She asserts that she was not "developing rules, policies, or procedures in relation to the work performed[,]" but rather "was simply ensuring that she was following Defendant's [existing] rules, policies, and procedures in relation to the worked performed[.]" (*Id.* at 15.) She argues that *Renfro* is distinguishable from this case because the plaintiffs in *Renfro* "were making independent decisions and exercising their judgment on a daily basis" through activities such as "advising management, interpreting and carrying out plant policies, creating plans that permit continued operation of equipment and systems that generate AEP's main product, [and] independently determining the nature of a repair task," while Reitz performed no such activities. (*Id.* at 16 (citing *Renfro*, 370 F.3d at 518–19).) Similarly, she argues that *Burton* is distinguishable because "in *Burton*, the plaintiff's primary duties included renewing existing business, developing strategies to grow relationships, executing strategies, developing strategic sales plans for each account, tracking revenue trends, analyzing competitive threats, negotiating pricing and contracts, and

closing sales[,]" but Reitz "did not perform similar functions in her position." (*Id.* at 16–17 (citing *Burton*, 682 F. App'x at 425).)

An employee's "primary duty" is "the principal, main, major, or most important duty that the employee performs. . . . with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). According to 29 C.F.R. § 541.201(a), administrative employees are those who "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." "Work directly related to management or general business operations includes, but is not limited to" the following examples: "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). The Sixth Circuit has held that an administrative employee is one whose work is "ancillary to an employer's principal production activity." *Lutz v. Huntington Bancshares*, 815 F.3d 988, 993 (6th Cir. 2016) (quoting *Renfro v. Ind. Mich. Power Co.,* 370 F.3d 512, 517 (6th Cir. 2004)).

Reitz's duties in the unit renovation process were "ancillary to [Laurel Lake's] principal production activity[,]" which is operating a continuing care retirement community. *Renfro*, 370 F.3d at 512. As Laurel Lake notes, Reitz's duties "did not include providing any services or care to or even interacting with residents who live in the senior living community." (Doc. No. 35, at 12 (citing (Doc. No. 35-1 (Deposition of Joan Reitz), at 4).) Because Reitz did not participate in Laurel

Lake's principal production activity, but rather supported it through other activities, her duties were analogous to those of employees in other cases which the Sixth Circuit deemed to be ancillary to the employer's principal activity. For example, in *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 645–46 (6th Cir. 2013), the Sixth Circuit held that special investigators employed by an insurance company met this requirement because they did not write or sell insurance policies, which were the company's product. Like those special investigators, Reitz did not directly provide Laurel Lake's "primary production activity," a continuing care retirement community, because she did not actually perform the renovations to the senior living units or provide care to the residents. Reitz's interactions with residents once they moved in consisted of talking to them when she "saw them in the hallway or at events" and asking "how they were doing" and "if they had settled in comfortably." (Doc. No. 35-1, at 4.) She estimates that these interactions were "probably 5 and 10-minute conversations." (*Id.*) Additionally, in *Renfro*, 370 F.3d at 518, the Sixth Circuit held that planners employed by a power company met this requirement because their primary duty of "creating plans for maintaining equipment and systems in the nuclear plant" was "ancillary to [the company]'s principal production activity of generating electricity." Similarly, Reitz's duty of facilitating plans for renovations was "ancillary to" Laurel Lake's "principal production activity" of providing a continuing care retirement community.

Reitz maintains that her duties differed completely from those of the employees in *Renfro*. (*See* Doc. No. 34, at 16.) She insists that she merely served as a "middle-man" between Laurel Lake's maintenance department, director, contractors, subcontractors, vendors, suppliers, and residents, facilitating the exchange of information among the groups with no discretion to alter or affect any material aspect of the renovations that were to be performed. (*Id.* (collecting cites from

Doc. No. 34-1).) While these distinctions ultimately create important factual disputes with respect to the third requirement, they are simply not relevant for purposes of the second requirement—under Sixth Circuit law, what matters is that Reitz's duties were ancillary to Laurel Lake's principal production activity. *See Renfro*, 370 F.3d at 517. All of the facts discussed support the conclusion that Reitz's primary duty was "non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201. This satisfies the second requirement for being correctly classified as an exempt employee under 29 C.F.R. § 541.200(a).

This leaves only the third prong, which requires that an employee's primary duties "include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The parties dispute whether Reitz's former position satisfies this final requirement. (*See* Doc. No. 30, at 20; Doc. No. 34, at 17.) Laurel Lake argues that Reitz's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." (Doc No. 30, at 20 (citing 29 C.F.R. § 541.200(a).) It contends that Reitz "exercised independent discretion and judgment" in areas such as "[i]nspecting vacant units to make decisions and recommendations as to what needed to be renovated, repaired, or upgraded;" "[i]dentifying contractors, obtaining quotes . . . , and awarding projects to contractors after evaluating the quotes to make sure the pricing was in line with expectations;" and "[e]nsur[ing] renovations [were] on track to allow other contractor work to begin and meet deadlines[.]" (Doc. No. 35, at 15.) Reitz asserts that her position did not meet this requirement. (Doc No. 34, at 17.) She argues that she was merely "following [Laurel Lake]'s prescribed techniques, procedures, and specific standards[,]" rather than exercising independent judgment. (*Id.* at 19.)

11

In determining whether an employee exercises discretion and independent judgment with respect to matters of significance, it is necessary to consider "all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). The exercise of discretion and independent judgment generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The regulation identifies factors to consider, including, but not limited to:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree . . . whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management . . . whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). Although the phrase "discretion and independent judgment" "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review[,]" it must involve "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(c), (e).

Laurel Lake argues:

> [Plaintiff] exercised independent discretion and judgment as to contractors and vendors to solicit bids, reviewed and compared bids, selected or recommended contractors and vendors or her recommendations were given significant weight, scheduled the work of contractors, vendors, and the Maintenance Department, and monitored all aspects of the work, including quality control, to ensure timely

12

completion of the renovations. She exercised independent discretion and judgment as to whether to change the schedule or to switch contractors or vendors to avoid delays. She independently reviewed and approved invoices, deciding whether follow-up was needed before approving payment. Though Plaintiff could go to Anderson or the Maintenance Department with questions or recommendations, she had to exercise her independent judgment to ensure renovations were completed on time and in accordance with the resident's satisfaction. Plaintiff also took the lead on updating the material options for renovations that new residents were given for paint colors, carpet, wood flooring, cabinetry, tile, and other materials. Plaintiff analyzed the options available from vendors and presented her choices to the team.

(Doc. No. 30, at 21–22 (internal citations omitted).)

In opposition, Reitz asserts that her role in renovations did not involve the kind of discretion and evaluation contemplated by the regulation. She argues:

 [I]t is clear that Plaintiff Reitz was merely applying what Tim Hanna[, Laurel Lake's former move-in coordinator and painter/mechanic,] taught her during training in following Defendant's prescribed techniques, procedures, and specific standards – she performed walk-throughs (usually with the maintenance mechanic or maintenance supervisor/manager); met with residents to obtain information from them with respect to the renovations they requested; showed residents carpet samples, paint colors, counter-top options that were pre-approved and available in Defendant's showroom; gathered information from residents; gathered quotes and bids from contractors, vendors, and/or suppliers who were pre-determined by Defendant as approved to perform work on residential units and/or to supply materials; utilized the information, quotes, and costs provided to her to prepare the renovation quotes and work orders; assisted in ordering the supplies once they were approved; and monitored to ensure that the 90-day timeline set by Defendant was met.

(Doc. No. 34, at 19–20 (internal citations omitted).)

It is clear that the parties view Reitz's previous role very differently. They more or less agree on the tasks she performed. But they disagree as to whether the performance of those tasks required the exercise of discretion and/or independent judgment on matters of significance or involved merely relaying messages among parties and following Laurel Lake's renovation procedures. Evidence from the depositions of Reitz and her former supervisor, Donna Anderson,

13

further demonstrates issues of fact as to whether Reitz exercised "discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

For example, Laurel Lake asserts that Reitz "took the lead on updating the material options for renovations that new residents were given for paint colors, carpet, wood flooring, cabinetry, tile, and other materials." (Doc. No. 30, at 21–22.) But statements from Reitz and Anderson's depositions call into question whether Reitz exercised independent judgment in these matters. Reitz stated that the materials in Laurel Lake's marketing showroom that were presented to residents as options for renovations were "there long before [she] started[.]" (Doc. No. 34-1, at 10.) Reitz may have had some discretion in updating the material options, but there is evidence suggesting that her discretion in that process was minimal. Anderson testified that when the material options needed to be updated due to materials going out of production, Reitz would "narrow the choices down to a small array of options and then would often bring those options back to our marketing team to look at so that [we] would all . . . give opinions[.]" (Doc. No. 34-3, at 15.) Importantly, Reitz would not independently make the final decision on which materials would be available to residents, but rather, the marketing department "look[ed] at everything together and kind of agree[d] together." (*Id.*) The maintenance department was involved in this process as well to ensure that the materials selected were "going to be durable and [were] going to fit the price point that [Laurel Lake] need[ed.]" (*Id.*) Furthermore, Reitz explained that when it came to choosing new carpet samples to present to residents, she merely "gave [her] opinion" on samples Laurel Lake's carpet representative presented, along with the rest of the marketing team. (Doc. No. 34-1, at 10.) This evidence indicates that, contrary to Laurel Lake's assertions, Reitz may not have had independent discretion regarding the material options presented to residents.

14

Rather, she may have simply showed options to the marketing and maintenance departments, which made final decisions as a group.

Additionally, Laurel Lake argues that Reitz exercised independent judgment in selecting contractors for each project (Doc. No. 30, at 21). But there are factual disputes as to how much discretion Reitz had in selecting contractors. Reitz asserts that this duty did not constitute independent judgment because the contractors were selected from among those "pre-determined by" Laurel Lake. (Doc. No. 34, at 19–20; *see* Doc. No. 30-2 ¶ 7.) Furthermore, Anderson testified in her deposition that Reitz chose contractors from whom to solicit bids based only on who was available to complete the work in the time frame that was also pre-determined. (Doc. No. 34-3, at 21.) After receiving bids from the contractors, Reitz did not independently choose which contractor to present to the resident, but rather made the decision with Tartaglione and only had "some input." (Doc. No. 34-1, at 11–12.) When a resident did not have a preference regarding which contractor would perform their renovations, Tartaglione again had the authority to make the decision—Reitz explained that she "would have had some input, but it was always up to [Tartaglione] to make the managerial decisions[,]" as he had a "higher level of authority" than her. (*Id.* at 13.) Furthermore, Reitz's testimony indicates that she did not have the authority to add new contractors to the list of pre-approved contractors. Reitz explained that when she found out about a new contractor, she introduced them to the maintenance team or to Andrew Lovano, the facilities manager. (*Id.* at 3, 11.) She also stated that Tartaglione would "probably do some investigating to find out about the company" when she showed him a potential new contractor in order to decide whether to hire that contractor. (*Id.*) These quotes indicate that Reitz may not have had as much authority in the contractor selection process as Laurel Lake contends she did.

15

Evidence from the depositions also suggests that there are factual disputes as to whether Reitz exercised independent judgment in determining what work the contractors needed to do. Reitz stated that Tartaglione, not she, was responsible for reviewing the units to determine whether one of Laurel Lake's standard renovations, such as replacing carpet, needed to be done. (Doc. No. 34-1, at 9.) Reitz sometimes walked through units to check whether they had Laurel Lake's "standard upgrades" for tile and light fixtures, but she was not responsible for making the final determination as to whether an upgrade was needed in a unit. (*Id.*) Rather, she took notes on what she saw in the units and then made recommendations to Tartaglione and Lovano. (*Id.*; *see also* Doc. No. 34-3, at 12 (describing the marketing and move coordinator's walk-through process as "making a list of determinations [that] will need to be made"); *id.* at 13 (explaining that if a potential replacement in a unit "seemed a bit borderline, and it was questionable whether or not Laurel Lake would want to replace them, then [Reitz] would usually consult with . . . either the maintenance manager or the environmental services director to see what their thoughts were, because the cost of [renovations] came out of [the maintenance department's] budget").) Thus, Reitz's testimony demonstrates factual disputes as to how much authority she had over the types of work the contractors performed.

Another area that presents factual disputes is Reitz's role in financial matters related to renovations. For instance, Laurel Lake argues that Reitz exercised independent judgment when she "independently reviewed and approved invoices[.]" (Doc. No. 30, at 21.) But Reitz's deposition indicates that her discretion regarding invoices was minimal, essentially limited to checking for errors. Reitz stated that she reviewed invoices "[j]ust to make sure the numbers matched what they had bid. And then if there were any increases, that they showed that there was

16

a need for that, and that they consulted with [Laurel Lake] about the increase." (Doc. No. 34-1, at 16.) She further explained that there were only "maybe a couple times where something came into question." (*Id.* at 17.) As an example, Reitz recounted a scenario in which a bill came in higher than what Laurel Lake had originally estimated, so she contacted the vendor, who discovered that they had made a clerical error and then adjusted the bill. (*Id.*) In addition to Reitz's possible lack of discretion with invoices, there is evidence that she lacked discretion with work orders. Although Reitz created work orders for renovation projects, a fact Laurel Lake highlights in its briefing (Doc. No. 30, at 12), she often "took the wording exactly from [the contractor's] quote and put it in the work order." (Doc. No. 34-1, at 14.) If there was something unusual about the quote, she reviewed it with Tartaglione. (*Id.*) There is also evidence suggesting that Reitz may have lacked authority over budgetary decisions. Regarding decisions to cover the costs of renovations beyond Laurel Lake's standard renovations, Anderson testified that "[t]he marketing and move coordinator has *some discretion in very small things*, but if there was a significant cost, the marketing and move coordinator is usually not going to make major decisions like that that without discussing it with maintenance." (Doc. No. 34-3, a 17 (emphasis added).) This was because renovations came out of the maintenance department's budget. (*Id.* at 13.) All of this testimony shows that the parties disagree about how much authority Reitz had regarding financial matters.

Additionally, Laurel Lake insists that it was Reitz's responsibility to make sure things were completed in a timely fashion (Doc. No. 30, at 21), but that there are clear factual disputes as to the level of control, discretion, and authority she actually had in the renovation process**.** Reitz stated in her deposition that she did not have the authority to "set deadlines and request that people work overtime to get projects finished[]" and "didn't manage anything to do with the timeline[,]"

but rather "merely asked the resident what their desired date to move in would be and tried to get things done before then." (Doc. No. 34-1, at 17–18). While Reitz worked to "make sure [the contractors] were staying on track[,]" she brought any concerns regarding the timeline to Tartaglione's attention, rather than handling them herself. (*Id.* at 14.) Furthermore, the contractors "would coordinate [the] timing" for the various types of work being performed and "would let [Reitz] know when they were all out and done[,]" rather than her telling them when they needed to leave so that the next contractor could come. (*Id.* at 18.) Moreover, Reitz explained that in the unit renovation process, she was merely "the middle man" between the contractors, the marketing department, the maintenance department, and the residents and "just kind of relayed information from one party to the other, instead of the resident talking directly with a contractor." (*Id.* at 16.)[4] She explained that her role was not like that of a project manager on a construction project because she "wasn't assigning particular tasks or managing any of the people that were doing the work." (*Id.*) When Reitz thought there was an issue with a contractor's work, she asked Tartaglione for his opinion because he "definitely had more experience in the field [of construction]." (*Id.* at 15.) Additionally, she testified that either Tartaglione or Lovano was responsible for reviewing the contractor's work to determine whether it met Laurel Lake's standards. (*Id.* at 18.) These statements demonstrate that Reitz has a different view than Laurel Lake regarding how much authority she had over both the renovation timelines and the renovations themselves.

These examples demonstrate the existence of genuine issues of material fact and therefore preclude summary judgment. Overall, whether Reitz exercised independent judgment on matters

---

[4] Indeed, Reitz was not capable of directing the contractors regarding their work because her only renovation and construction experience was from working on her own house. (*Id.* at 9–10.)

of significance is a close call. She clearly was intimately involved with the renovation and move-in process. But the questions of fact raised by Reitz and Anderson's deposition testimony prevent the Court from determining the extent to which Reitz exercised independent discretion in these areas.

Although Reitz does not dispute the first requirement for application of an administrative exception (salary basis) and the Court has determined that defendants have established the second requirement (office or non-manual work directly related to business operations), a fact-finder must resolve the material factual disputes relating to the third requirement—whether Reitz had a primary duty that included the exercise of discretion and independent judgment with respect to matters of significance. Therefore, summary judgment in favor of Laurel Lake on the question of classification is precluded.

### 2. *Liquidated Damages; Good Faith*

Laurel Lake asks this Court to rule that even if Reitz was not properly classified as exempt, Laurel Lake "acted in good faith and had reasonable grounds for believing that its action or omission was not an FLSA violation." (Doc. No. 29 ¶ 7 (citing 29 U.S.C. § 260).)  Reitz opposes such a ruling, arguing that Laurel Lake has not met its burden in establishing a "good faith" defense. (Doc. No. 34, at 21.) "An employer who violates the FLSA must pay the affected employee 'the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and [ ] an additional equal amount as liquidated damages.'" *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 605 (6th Cir. 2013) (quoting 29 U.S.C. § 216(b)).

"The good faith standard under the FLSA is more stringent than it is in many other contexts. Even negligent, as opposed to willful mis-classification of an employee is enough to prevent the

application of the good faith exception." *Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895, 902 (N.D. Ohio 2006), *aff'd*, 249 F. App'x 441 (6th Cir. 2007). "A showing of good faith includes a duty to investigate potential liability under the FLSA." *Id.* The employer bears the burden of demonstrating that it acted in good faith. *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002). Even if a court finds that a defendant has met its burden in establishing good faith, it is within the Court's discretion to deny liquidated damages. *See McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971) (quoting 29 U.S.C. § 260) ("[W]here an employer 'shows to the satisfaction of the court' that his violation was 'in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act,' then the court 'may, in its sound discretion,' award a lesser amount or no liquidated damages at all.").

Sixth Circuit precedent suggests that conferring with an attorney or relying on an opinion letter from a government official constitutes good faith under 29 U.S.C. § 260. In holding that an employer did not meet its burden of proving that it acted in good faith, the Sixth Circuit noted that the employer did not "suggest[] that it was relying on the expertise or opinion of any other person or entity with knowledge of the FLSA regulations, including its attorney or the Department of Labor." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 841 (6th Cir. 2002); *see also Featsent v. City of Youngstown*, 70 F.3d 900, 906–07 (6th Cir. 1995) (holding that an employer acted in good faith when it was represented by counsel while negotiating employment contracts and its attorney did not advise the employer that its method of calculating overtime compensation violated the FLSA).

Laurel Lake argues that it acted in good faith because it had Reitz's position reviewed by a third-party consultant to ensure that it was correctly classified. (Doc. No. 30, at 23–24.) It notes

20

that this consultant is an expert in human resources matters, including FLSA classification. (Doc. No. 35, at 18.) But seeking advice from a third party is not dispositive of the issue of good faith. *See Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 856–57 (6th Cir. 2019) (holding that reliance on an accountant's advice was not "sufficient evidence to meet [the employer's] substantial burden to prove both good faith and reasonable grounds for the incorrect classification" when "[the employer] knew that [the accountant]'s advice was flawed or incomplete," "[the employer] never discussed any of his employees' duties with [the accountant] such that [the employer] could reasonably believe that [the accountant] was advising that specific employees were exempt[,]" and the accountant "did not hold himself out as an expert in FLSA matters").

Furthermore, Sixth Circuit precedent does not indicate that seeking advice from a consultant, even one with expertise on FLSA issues, constitutes good faith as a matter of law. "[C]aselaw usually cites discussions with attorneys or government officials as evidence of good faith[.]" *Id.* at 857 (citing *Elwell*, 276 F.3d at 841; *Featsent*, 70 F.3d at 906–07). Laurel Lake's CEO testified that Laurel Lake did not seek advice from the Department of Labor on compensation of its employees (Doc. No. 34, at 23 (citing Doc. No. 30-6 (Deposition of David Oster), at 2).) Additionally, there is no evidence that Laurel Lake consulted an attorney on this matter. Therefore, the Court cannot determine as a matter of law that Laurel Lake acted in good faith.

The cases Laurel Lake cites to argue that relying on advice by expert professionals constitutes good faith do not change this result. (*See* Doc. No. 30, at 23; Doc. No. 35, at 19–20.) They involve different procedural postures than the instant case and therefore do not support making this determination as a matter of law. *See Reyes v. Falling Stores Enters.*, No. 6:04-cv-1648, 2006 WL 1319418 (M.D. Fla. May 11, 2006) (making conclusions of law following a bench

trial); *Fraser v. Patrick O'Connor & Assocs., L.P.*, No. H-11-3890, 2018 WL 8732101 (S.D. Tex. Sep. 17, 2018) (same); *Acosta v. Mezcal, Inc.*, No. 17-0931, 2019 WL 2550660 (D. Md. June 20, 2019) (denying *plaintiff's* motion for summary judgment). While the employment of an independent consultant is one fact that the jury may consider at trial if it reaches the question of willfulness, it does not entitle Laurel Lake to summary judgment on this issue.

Here, the Court has determined that there is a genuine issue of material fact as to whether Reitz was properly classified as an exempt employee because there is a dispute as to the discretionary nature of her job duties. If a violation is found, whether Laurel Lake acted in good faith is a factual determination best resolved by a fact-finder or by way of an appropriate Rule 50 motion at trial. *See Stansbury v. Faulkner*, 443 F. Supp. 3d 918, 935 (W.D. Tenn. 2020) ("The willfulness determination is a question of fact. A district court should only answer the question as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.") (collecting cases).

To the extent Laurel Lake seeks summary judgment on the issue of willfulness, its motion is denied.

## III.    CONCLUSION

For the reasons set forth herein, Laurel Lake's motion for summary judgment (Doc. No. 29) is DENIED.

**IT IS SO ORDERED**.

Dated: January 29, 2024

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

22